UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAKIMA PATTERESON,

                    Petitioner,                    Case No. 1:13-cv-503

v.                                                 Honorable Paul L. Maloney

CINDI S. CURTIN

                    Respondent.
_____/

## OPINION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.

Following a jury trial in the Kalamazoo County Circuit Court, Petitioner Jakima Pattereson[1] was convicted

of armed robbery, MICH. COMP. LAWS § 750.529.  On August 15, 2011, Petitioner was sentenced as

a fourth-offense felony offender, MICH. COMP. LAWS § 769.12, to a prison term of 11 to 30 years.  In

his *pro se* petition, Petitioner raises three grounds for relief, as follows:

    I.      WHETHER [PETITIONER] WAS DENIED HIS RIGHT TO DUE PROCESS
AND A FAIR TRIAL BY THE POLICE OFFICER'S TESTIMONY THAT
HIS INVESTIGATION ELIMINATED A SUSPECT IN THE ROBBERY
AND BY THE PROSECUTOR'S IMPROPER COMMENTS VOUCHING
FOR THE CREDIBILITY OF PROSECUTION WITNESSES AND FOR
[PETITIONER]'S GUILT; COUNSEL WAS INEFFECTIVE FOR FAILING
TO OBJECT.  US CONST AM VI; XIV.

---

[1]On all of the documents Petitioner submits and on many of the state-court records, Petitioner's name is spelled
"Patterson."  However, on the Offender Tracking Information System (OTIS) maintained by the Michigan Department
of Corrections (MDOC), Petitioner's name is spelled "Pattereson."  The Court has used spelling that matches the MDOC
records, in order to ensure that Petitioner receives all relevant mailings.

    II.      WHETHER [PETITIONER] WAS DENIED HIS RIGHT TO DUE PROCESS BY THE USE OF A PHOTOGRAPHIC LINEUP AND THE FAILURE TO PROVIDE A LIVE LINEUP; COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE TO SUPPRESS THE IDENTIFICATION OR REQUEST A LIVE LINEUP.  US CONST AM VI, XIV.

    III.    WHETHER [PETITIONER] WAS DENIED HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS BY THE POLICE OFFICER'S UNRESPONSIVE TESTIMONY THAT [PETITIONER] EXERCISED HIS RIGHT TO REMAIN SILENT UPON HIS ARREST; COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT.  US CONST V; VI; XIV.

    IV.    THE PROSECUTOR'S COMMENTS DENIGRATING THE DEFENSE DENIED DEFENDANT A FAIR TRIAL; COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT.  US CONST AM VI; XIV.

On December 11, 2013, Respondent filed the state-court record, pursuant to Rule 5, RULES GOVERNING § 2254 CASES, and an answer to the petition (ECF No. 7), stating that the grounds should be denied because they are noncognizable, procedurally defaulted, and/or without merit.  Upon review and applying the AEDPA standards, the Court finds that all habeas grounds are either noncognizable or meritless.  Accordingly, the Court will deny the petition for failure to raise a meritorious federal claim.

**<u>Procedural and Factual Background</u>**

    Petitioner was charged with armed robbery and first-degree home invasion.  It was alleged that, together with Ebony Crayton, Petitioner entered into the home of Mark Sanford.  Petitioner threatened Sanford with a box cutter, and he and Crayton stole Sanford's wallet and some money from under Sanford's mattress.

Mark Sanford testified that he lived at 1230 Bixby in Kalamazoo County on April 8, 2011. He met Ebony Crayton when she was visiting a friend of his. (Tr. I,[2] 141.) When she came to his house on the afternoon of April 8, 2011, Crayton asked to use Sanford's cell phone. While she was there, the two had a romantic episode. (*Id.*, 143.) About 15 minutes later, Crayton returned, again wanting to use Sanford's phone. When she got the phone, she turned it off. Sanford demanded that she give it back, but, by that time, Petitioner had stepped through the doorway into Sanford's living room. Sanford identified Petitioner in the courtroom. (*Id.*, 144.) Sanford turned around and saw Petitioner and told him to leave. Petitioner was holding a box cutter with the blade out, and he said, "Give me your money." (*Id.*, 145.) Petitioner and Crayton repeated the demand several times. Sanford went to his kitchen and grabbed a screwdriver. He then walked toward Petitioner, in an attempt to get Petitioner to leave. Crayton went into the bedroom and took the money from under Sanford's mattress, which amounted to about $180.00. (*Id.*, 145-46.) Crayton also took Sanford's wallet out of Sanford's pant pocket. (*Id.*, 146.) Sanford said, "There's no money in there, just give me my wallet." (*Id.*, 147.) The two ran out of the apartment, and Sanford followed them out the door, while trying to turn his phone on. Sanford heard Petitioner say, "[H]e's calling 911." (*Id.*) Sanford testified that, as a result of toxic-chemical exposure in his workplace in 1986, he had substantial physical limitations, which caused him to move slowly, preventing him from chasing Petitioner rapidly. (*Id.*, 154.) Sanford saw Petitioner throw down the box cutter at the end of the

---

[2]The two days of trial transcript are designated as follows:

July 12, 2011 (ECF No. 10):  Tr. I;
July 13, 2011 (ECF No. 11):  Tr. II.

housing complex, and it landed in the flowerbed. (*Id.*, 147.) Sanford picked up the box cutter, which had

its blade retracted, and carried it into his house. He identified that box cutter as People's Exhibit Number

1. (*Id.*, 148, 150.) Sanford immediately called 911, with whom he was on the phone by the time he saw

Crayton jump into a truck and saw Petitioner working his way up the street. (*Id.*, 151.)

        A township police officer responded to the 911 call. Later, the officer returned and

showed Sanford two arrays of six photographs, one set of males and one of females. Sanford identified

Crayton and Petitioner as the two people involved in the robbery, and he initialed their photographs in the

arrays. (*Id.*, 151-52.)

        On cross-examination, defense counsel impeached Sanford with his earlier statements made

to police and his testimony during Crayton's preliminary examination. Sanford originally told the police that

he did not know Crayton, though he later testified that he had met her before. (*Id.*, 156.) Sanford also

admitted that, when Crayton first visited on the day of the robbery, she asked to use the phone, and she

actually made a call. Crayton then told him that she really needed some money. He paid Crayton ten

dollars to perform oral sex on him. (*Id.*, 156-57.) Sanford acknowledged that he did not originally tell the

police about the first visit or that he had paid Crayton for sex. (*Id.*, 160.) When Crayton came back the

second time, Sanford opened the door to her. He did not see anyone else at that time; the man did not

come in until later. On the second occasion, Sanford was not sure whether Crayton actually used the

phone, he only remembered that it was turned off when she returned it to him. (*Id.*, 159.) Sanford denied

telling the police that Petitioner had held the knife to Sanford's chest, though he acknowledged that the

allegation was included in the police report. Sanford admitted that Petitioner originally stood about two

or three feet inside the house, about six feet from Sanford. When Sanford began to come toward

Petitioner, Petitioner said, "I'm gonna cut you, I'm gonna cut you." (*Id.*, 162.) By the time Sanford got to the doorway, Petitioner was only about two or three feet away from him. (*Id.*, 163.) Sanford acknowledged that it was Crayton who took his wallet and who apparently knew where to find his money under his mattress. Crayton had been in the bedroom earlier, when she had performed oral sex. (*Id.*, 163.) On police questioning, Sanford also denied that there were drugs in the house, ostensibly because there were none present at the moment of inquiry. (*Id.*, 165.) Sanford admitted to police that his roommate Leslie Snook was very possibly a drug user. (*Id.*, 156, 166.) He acknowledged that he did not tell anyone about the screwdriver, about knowing Crayton, or about having oral sex with her until questioned by defense counsel at Crayton's preliminary examination. (*Id.*, 170-71.) Crayton also denied police questions about whether Crayton was a prostitute and whether they had talked about drugs. (*Id.*, 173.) Further, Crayton's phone, which had her picture, was left at Sanford's house. (*Id.*, 173.) Sanford acknowledged that he had never seen Petitioner before the incident. (*Id.*, 168.) Sanford identified Petitioner only from a photograph, mostly by the eyes; he never saw a live lineup. (*Id.*)

Ebony Crayton testified that she had pleaded guilty to unarmed robbery for her conduct in the robbery of Sanford. (Tr. II, 182.) Under the plea agreement, her charges were reduced from the original charge of armed robbery, in exchange for her guilty plea to the lesser charge and her promise to testify truthfully at Petitioner's trial. She did not, however, receive any sentencing promises. (*Id.*, 183.) Crayton testified that she knew Sanford because he was the neighbor of her boyfriend. Crayton was a friend of Sanford's live-in girlfriend. According to Crayton, on the day of the robbery, Sanford asked her to get some drugs for him. She called Petitioner, and they went back to Sanford's apartment to sell him some drugs. After they arrived, Sanford was afraid to make the deal, because he did not know Petitioner.

Petitioner responded that he was not leaving until he got paid. (*Id.*, 184.)  Sanford picked up a screwdriver, and Petitioner held a box cutter. (*Id.*, 185.) She did not see the box cutter until after Sanford picked up the screwdriver. (*Id.*, 196-97.) Petitioner did not approach Sanford, but he had the box cutter in his hand. (*Id.*, 185.) After a couple of minutes, Crayton took Sanford's wallet. She then went to the bedroom and flipped the mattress, finding the money there. (*Id.*, 185, 197.) She testified, "I didn't want it to get – go any further than what it really had to be. . . . I just wanted to give him the money and just get up out of there." (*Id.*, 185-86.) When they left the apartment, she gave some of the money to Petitioner. (*Id.*, 186.)

On cross-examination, Crayton acknowledged that her plea deal exposed her to a significantly lower sentence because of the lesser charge.  She admitted to having been previously convicted of retail fraud and home invasion.  She also admitted that she had told the police lies earlier in the investigation. (*Id.*, 187.) She told police that she did not know Petitioner, though she ultimately admitted that she did.  She also told the police that she was high on crack and alcohol that afternoon, though she denied that her recollection of the incident was fuzzy because of that. (*Id.*, 188.) She also testified that Sanford had smoked crack the first time she was at the house that day. (*Id.*, 195.) Crayton stated that Sanford was lying if he said that drugs had nothing to do with the incident. (*Id.*, 189.) She testified that she had known Sanford for about a week prior to the robbery.  She had been at his house earlier that day, and she gave him oral sex in exchange for money. (*Id.*, 189.)  According to Crayton, she went to Sanford's house because the woman he was living with called her and told her to find someone who could get the heroin they wanted. (*Id.* at 189-90.) When Crayton got to the house, the woman was not there, so she waited.  Sanford brought up the idea of oral sex.  The act happened where Petitioner was standing,

between the living room and the bathroom. Crayton denied going into the bedroom at that time. (*Id.*, 190.) She had, however, previously seen his bedroom. Crayton did not know about the money being under the mattress, and she expected Sanford to pay for the drugs from his wallet, as he had paid for the sex. (*Id.*, 191.) While she was at Sanford's house that first time, she used his phone to call her friend Bobby Shears, with whom she lived, to see if the man she wanted to reach about the drugs was at Bobby's house. Crayton acknowledged that a cell phone was left at the scene. (*Id.*, 191, 202.) She told the police that the phone belonged to Bobby Shears, that he loaned it to her sometimes, and someone had stolen it. (*Id.*, 192-93.) In reality, while the phone belonged to Shears, Crayton had been using the phone for some time and she accidentally left it at the scene. (*Id.*, 192-93, 195, 201.) Crayton explained that she had to use Sanford's phone to make a call, because hers was not in service at that time, and she just used it to store her numbers and contacts. (*Id.*, 193.) Crayton came back to Sanford's house about 30 minutes later, accompanied by Petitioner, to sell drugs to Sanford. (*Id.*, 192-93.) She asked to borrow Sanford's phone again, but she did not really need it and just pretended to use it. (*Id.*, 193-94.)

Crayton testified that she talked to the police on four occasions. While she admitted not telling the truth about everything, she denied ever saying that Bobby Shears was involved in the theft. She testified that, if the police report indicated that she blamed it on Bobby Shears, the report is wrong. (*Id.*, 195, 199-201.) When she was pretending not to know Petitioner, Crayton described the man who was involved as a dark-skinned black guy with big lips, who was stocky. (*Id.*, 195-96.) Crayton also told police that she was a middleman for certain kinds of drug drops, such as the one in issue. (*Id.*, 196.) Crayton testified that Petitioner and Bobby Shears look very different. Shears is taller, older, bald, and wears a long, braided goatee. (*Id.*, 202.)

Kalamazoo Township Police Officer Mark Burkett responded to Sanford's 911 call. Sanford described a black female in her 20s and a black male who was a somewhat older, a bit stocky and tall. (*Id.*, 204.) Burkett took into his possession the box cutter Sanford had brought into his apartment. Burkett also took possession of the cell phone left in the apartment. (*Id.*, 205.) Burkett opened the phone and saw Crayton's picture on it. (*Id.*, 210-11.) He contacted Crayton, and she told him that the phone was owned by Bobby Shears. Crayton told him that she had been using it for about two months, but she was not using it on April 8, 2011. (*Id.*, 211.) After speaking with Crayton, Burkett spoke with Bobby Shears. He was able to get information that led him to believe that Shears was not involved in the case. (*Id.*, 212-13.) He then asked Crayton back for another interview. She told him that she worked as a prostitute and was a drug addict. (*Id.*, 213.) Crayton told Burkett that she had learned from Bobby Shears that Mark Sanford had been robbed. (*Id.*, 217.) She also told police that, when she was walking around the city, she had run into the man she knew as "Jakima," who told her, "I got over on that white guy." (*Id.*, 218.) After giving multiple stories, she told Burkett that she sometimes worked as a middleman on drug deals. She told him that Sanford's girlfriend, Leslie Snook, had called to ask her about purchasing heroin. Crayton was going to be the middleman on the deal. When Crayton went to the apartment for the first time, she smoked crack cocaine with Sanford. She reported that Sanford started acting strange and asked her to leave, which she did. (*Id.*, 214.) Crayton ultimately admitted that she spoke with a man she knew by the name "Jakima." (*Id.*, 214-15.) She reported that she went to a liquor store, bought some liquor, and stayed at 701 Trimble for the night. She did not admit to going back to Sanford's house at that time. Crayton later was arrested on a warrant. (*Id.*, 214.) As Burkett was taking her to the jail, Crayton told Burkett that she had lied earlier so as not to implicate herself. She told Burkett that she was present

-8-

when Sanford was robbed and that he was an easy target.  (*Id.*, 218.)  Crayton stated that she had

committed the robbery with Jakima.  But she objected to being charged with armed robbery, saying, "How

was it armed?  I didn't have a weapon."  (*Id.*, 219.)

Burkett talked with Sanford numerous times.  At one point he put together photo arrays

for Sanford to review.  Burkett identified Exhibits 3 and 4 as the photo lineups he had shown to Sanford.

He explained that the arrays are generated by a computer database.  (*Id.*, 219-20.)  The arrays included

photos of Crayton and Petitioner, Jakima Patterson, because, by that time, Burkett had reason to believe

that they were involved.  (*Id.*, 220, 222.)  The computer randomly placed the photos of Crayton and

Petitioner in the top left corners of their arrays.  (*Id.*, 229.)  Sanford picked Crayton and Patterson from

the respective lineups.  (*Id.*, 224-25.)

On cross-examination, Burkett testified that he had investigated Bobby Shears and

concluded that he did not think that Shears was involved.  (*Id.*, 227.)  He could not say whether Shears

and Petitioner looked alike.  (*Id.*, PageID.226-27.)  Burkett acknowledged that he did not see Sanford

bring the box cutter to the apartment and he did not see it on the ground.  No identifiable prints were found

on the box cutter.  (*Id.*, 228-29.)  Burkett also affirmed that Sanford had originally denied knowing

Crayton, but it later turned out that he did.  (*Id.*, 229-30.)  No live lineup was ever held, at which an

attorney could be present and the witness could see a three-dimensional view of the people in the lineup.

Burkett acknowledged that was true, but he stated that he had never done a live lineup.  (*Id.*, 230-31.)

He also admitted that Crayton gave multiple stories, but neither Crayton nor Sanford had ever admitted

to having engaged in oral sex for money.  And Crayton never mentioned the presence of a box cutter at

any interview.  (*Id.*, 232.)  Burnett did not know whether he told Crayton that a box cutter was involved.

(*Id.*, 233.) Defense counsel asked whether anyone had interviewed Petitioner. Burkett responded that Detective Erlandson had attempted to interview Petitioner, but Petitioner invoked his right to remain silent. (*Id.*, 234.) The people rested and, after a brief recess, the defense put on no evidence. (*Id.*, 236, 238.)

Following oral arguments and jury instructions, the jury deliberated for two and one-half hours before returning with a verdict. The jury found Petitioner guilty of armed robbery, but not guilty of home invasion. (*Id.*, 286-87.) At a hearing held on August 15, 2011, Petitioner was sentenced to a prison term of 11 to 30 years. He was not given credit for time served, as he was on parole at the time of the offense. (Sentencing Hr'g Tr. (S. Tr.), 11, ECF No. 12.)

Petitioner appealed his conviction to the Michigan Court of Appeals, raising the four grounds presented in Petitioner's habeas application. In an unpublished opinion issued on September 20, 2012, the court of appeals denied all appellate grounds and affirmed the conviction. (Mich. Ct. App. Op., ECF No. 13.) Petitioner raised the same grounds in his application for leave to appeal to the Michigan Supreme Court. In an order dated March 4, 2013, the supreme court denied leave to appeal, because it was not persuaded that the questions presented should be reviewed by the court. (Mich. Ord., ECF No. 14.)

In his habeas application, Petitioner raises all four issues presented to and rejected by the Michigan appellate courts. Respondent filed an answer to the petition (ECF No. 7), contending that the claims are procedurally defaulted, noncognizable, or without merit. For the reasons that follow, the Court concludes that the petition should be denied for lack of merit.

### Discussion

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in

light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

I.      Ground I:  Admission of Evidence & Improper Prosecutorial Vouching

In his first ground for habeas relief, Petitioner contends that the prosecutor improperly elicited testimony from Officer Burkett to the effect that his investigation had eliminated Bobby Shears as a suspect, in violation of Petitioner's right to due process and a fair trial.  Petitioner also contends that the evidence amounted to impermissible opinion testimony that usurped the role of the jury.  In addition, Petitioner argues that the prosecutor compounded the misconduct by further vouching during closing argument.  Finally,  asserts that counsel was ineffective in failing to object to the prosecutor's conduct.

The Michigan Court of Appeals addressed all aspects of Petitioner's first habeas ground, as follows:

> On appeal, defendant first argues that he was denied his right to due process and a fair trial. Specifically, defendant maintains that Officer Mark Burkett's testimony violated his due process rights because it was "impermissible opinion testimony that usurped the role of the jury in determining guilt or innocence," in that Burkett's testimony that another individual was eliminated as a suspect implied that defendant was guilty, and constituted improper testimony vouching for defendant's guilt.
>
> Defendant failed to object to Burkett's testimony on the basis of due process or his right to a fair trial; accordingly, this issue is not properly preserved for review.[1]  We review unpreserved claims of constitutional error for plain error affecting defendant's substantial rights.  *People v Carines*, 460 Mich 750, 752-753, 764; 597 NW2d 130 (1999). Substantial rights are affected when the defendant is prejudiced, meaning the error affected the outcome of the trial.  *Id.* at 763.
>
> Defendant's arguments on appeal are based on Burkett's testimony regarding his investigation of a possible suspect, Bobby Shears:
>
> > [The Prosecutor]:  Let me ask you, officer, again, obviously without saying anything that Mr. Shears told you, did you make contact with him?
> >
> > [Officer Burkett]:  Yes I did.

> [The Prosecutor]: [A]gain, without telling me any specifics . . . did you learn anything that led you to consider him a suspect in this matter?
>
> [Officer Burkett]: I was able to eliminate him as a suspect.

While it is improper for a witness to comment on the guilt or innocence of the defendant, *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985), a review of the record reveals that Burkett never specifically opined about defendant's guilt or innocence; rather, Burkett testified that he investigated his lead regarding Shears and that his investigation ultimately led him to eliminate Shears as a suspect. In *People v Bennett*, 290 Mich App 465, 476; 802 NW2d 627 (2010), this Court addressed a similar situation. In *Bennett*, the defendants challenged the trial testimony of a police officer regarding "the nature of his investigation and the exoneration of prior suspects." *Id.* This Court found that the police officer's testimony in Bennett was not improper because the testimony "pertained merely to the exoneration of other suspects, none of whom were on trial or witnesses against defendants" in that case. *Id.* at 477. This Court explained that the credibility of other suspects was "not directly relevant to [the] defendants' guilt or innocence." *Id.* Accordingly, the fact that Burkett eliminated Shears as a suspect is not relevant to defendant's guilt or innocence. Because the elimination of Shears as a suspect has little bearing on defendant's guilt or innocence, Burkett's testimony did not constitute improper opinion testimony regarding defendant's guilt. Therefore, we conclude that defendant has not demonstrated plain error affecting his substantial rights in regard to Burkett's testimony.[2]

Defendant also argues that "the prosecutor further exacerbated the error" by stating that Crayton and the victim were truthful and honest during the prosecutor's rebuttal argument.

Because defendant failed to object to the prosecutor's comments, we similarly review this issue for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 752-753, 764.

Defendant's prosecutorial misconduct argument is based on the prosecutor's rebuttal argument that Crayton agreed to testify "truthfully" and that she received "a benefit for her truthful testimony," and that the victim and Crayton were "real people who were honest with you."

It is improper for the prosecutor to vouch for the credibility of a witness or question a witness in a way that conveys the message that the prosecutor has some special knowledge regarding the truthfulness of the witness. *People v Bahoda*, 448 Mich 261, 276-277; 531 NW2d 659 (1995). However, "[a] prosecutor is afforded great latitude

regarding his or her arguments and conduct at trial." *People v Fyda*, 288 Mich App 446, 461; 793 NW2d 712 (2010). Accordingly, "a prosecutor may comment on his or her own witnesses' credibility, especially when credibility is at issue. The prosecutor is free to argue from the evidence and its reasonable inferences in support of a witness's credibility." *Bennett*, 290 Mich App at 478.

In support of his prosecutorial misconduct argument, defendant briefly discussed *United States v Francis*, 170 F3d 546 (CA 6, 1999), and cited two decisions from this Court. However, defendant fails to explain the relevance of the cited cases in regard to his claim on appeal. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640; 588 NW2d 480 (1998). Therefore, we conclude defendant has failed to demonstrate plain error affecting his substantial rights in regard to the prosecutor's statements in rebuttal argument.

Nevertheless, to the extent that defendant's argument can be interpreted as a claim that the prosecutor committed misconduct in his rebuttal statements, we note that "a prosecutor may comment on his or her own witnesses' credibility, especially when credibility is at issue. The prosecutor is free to argue from the evidence and its reasonable inferences in support of a witness's credibility." *Bennett*, 290 Mich App at 478. In this case, the prosecutor's closing argument clearly asserted that the testimonies of the victim and Crayton were credible regarding defendant's guilt. However, the prosecutor based his argument on "the evidence and its reasonable inferences" and did not imply that he had special knowledge regarding the credibility of the victim or Crayton. *Id.* at 478. Moreover, the defense introduced the issue of witness credibility by challenging the credibility of the victim and Crayton throughout the trial. *Id.* Accordingly, the prosecutor's comments regarding the credibility of his witnesses did not constitute prosecutorial misconduct. *Id.* Moreover, even if the prosecution's argument was improper, any possible prejudice could have been cured by a timely objection and cautionary instruction. This Court will not find error requiring reversal if a curative instruction could have alleviated any prejudicial effect. *People v Callon*, 256 Mich App 312, 329-330; 662 NW2d 501 (2003).

Defendant alternatively argues that defense counsel was ineffective for failing to object to the alleged errors. Defendant did not move the trial court for a new trial on the basis of ineffective assistance of counsel, and the trial court did not hold a *Ginther*[3] hearing; accordingly, this issue is not preserved for appellate review. *People v Musser*, 259 Mich App 215, 220-221; 673 NW2d 800 (2003). Because defendant's ineffective assistance of counsel claim is unpreserved, our review is limited to mistakes apparent on the record. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). In order to prevail on an ineffective assistance of counsel claim, the burden is on the defendant to

demonstrate that defense counsel's performance fell below an objective standard of reasonableness, and that the deficiency so prejudiced defendant as to deprive him of a fair trial. *People v Pickens*, 446 Mich 298, 302-303, 311-312; 521 NW2d 797 (1994).

   In this case, defendant has failed to demonstrate that defense counsel's performance fell below an objective standard of reasonableness because counsel is not ineffective for failing to make a meritless objection. *People v Milstead*, 250 Mich App 391, 401; 648 NW2d 648 (2002). As discussed *supra*, Burkett's testimony did not constitute improper opinion testimony vouching for the guilt of defendant. The prosecutor's comments during his closing argument were similarly not improper because the argument was based on the evidence and was responsive to defendant's argument. Accordingly, defense counsel's failure to raise any objection to the alleged errors did not constitute ineffective assistance of counsel. *Id.*

[1] While defendant did object to Burkett's testimony on hearsay grounds, that objection was not sufficient to preserve his argument on appeal regarding due process and a fair trial. People v Asevedo, 217 Mich App 393, 398; 551 NW2d 478 (1996) ("An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground.").

[2] We note that defendant also argues on appeal that Burkett's testimony constituted improper hearsay, and that the trial court abused its discretion in permitting the testimony's admission. This issue is not properly preserved for appeal because defendant failed to include it in his statement of the question presented. People v Unger, 278 Mich App 210, 262; 749 NW2d 272 (2008); MCR 7.212(C). However, we note that defendant has not demonstrated error requiring reversal. "[A] preserved, non-constitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." People v Lukity, 460 Mich 484, 496; 596 NW2d 607 (1999), quoting MCL 769.26. Errors regarding the admission of evidence are nonconstitutional. People v Whittaker, 465 Mich 422, 426; 635 NW2d 687 (2007). Based on the evidence in this case, we cannot conclude that it is more probable than not that admission of the hearsay testimony was outcome determinative.

[3] *People v. Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973).

(MCOA Op., 1-4.)

   To the extent that Petitioner complains about the improper admission of evidence, his claim is not cognizable on habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal

habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).[3]

---

[3]Because Petitioner did not timely lodge a due-process objection to the evidence or the rebuttal argument, the court of appeals determined that the claims were not properly preserved on appeal, and it therefore reviewed the question only for plain error. "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010). Nevertheless, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

Petitioner has not and cannot met this difficult standard. At no time did Burkett express an opinion concerning Petitioner's guilt, an issue the Sixth Circuit has construed to implicate due process. *See Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir. 1988) (holding, in a case preceding AEDPA deference, that a police officer's opinion as to the defendant's guilt would violates due process). Instead, Officer Burkett commented only on the result of his investigation of Bobby Shears. Petitioner does not cite and the Court is unaware of any United States Supreme Court precedent holding that the admission of such evidence violates due process. As a consequence, Petitioner is not entitled to habeas relief on the evidentiary claim.

Moreover, Petitioner fails to demonstrate prosecutorial misconduct during the rebuttal argument. In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935). "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling*

*v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that

the state courts have substantial breathing room when considering prosecutorial misconduct claims because

'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*,

457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645).  Thus, in order to obtain habeas

relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of

his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement."  *Parker v.

Matthews*, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

        The federal courts have generally recognized two types of objectionable vouching.  *See

Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir.

2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see  Wogenstahl v.

Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single

standard).  The first type impermissibly places the government's prestige behind the witness to bolster the

witness' credibility.  *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir.

1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992).  In the second type of impermissible vouching,

also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to

the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.

*See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965);  *Henderson

v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).[4]

---

[4]The Court observes that, notwithstanding the Sixth Circuit's continuing application of its own precedent on vouching, *see  Wogenstahl*, 668 F.3d at 328-29 (citing *Johnson v. Bell*, 525 F.2d 466, 482 (6th Cir. 2008)), the Supreme Court has not directly held that vouching amounts to prosecutorial misconduct.  Given the Supreme Court's recent

Here, the prosecutor's remarks did not amount to improper bolstering of either type

recognized by the Sixth Circuit.  Instead, the prosecutor discussed the testimony of Crayton and Sanford,

recognizing that both had lied about some of their conduct, minimizing the things that made them look bad.

He emphasized that, as in everyday life, lying about some things does not mean a person always lies or is

incapable of telling the truth.  (Tr. II, 241-44.)  He referred the jury to the court's expected instructions

about evaluating credibility.  (*Id.*, 242.)  The prosecutor also argued that Crayton had no reason to lie,

because her plea agreement was dependent on her truthful testimony, and that Sanford had no reason to see

the wrong man convicted of robbing him.  (*Id.*, 248-49.)  Finally, the prosecutor argued as follows:

> You heard talk about a Bobby Shears or maybe some other person was there.
> [Crayton] knows both of these people, she told you they look nothing alike.
>
> Officer Burkett told you in the course of his investigation, which included at least
> three conversations with Miss Crayton and numerous conversations with Mr. Sanford, he
> was able to rule out this guy.  Jakima Patterson is the one who did this.

(*Id.*, 249.)

Defense counsel then actively argued Crayton's and Sanford's motives to lie and the facts

undermining their credibility.  For example, Crayton lived with Shears and used his phone, which suggested

both that Shears was likely connected to the incident and that Crayton had every reason to steer the police

away from Shears.  Crayton also had every reason to lie to help convict Petitioner, so as to improve her

---

admonitions to the courts regarding the limits of clearly established general principles, it is doubtful that vouching has been clearly established by the Supreme Court as a due process violation.  *See, e.g., Lopez v. Smith*, 135 S. Ct. 1, 3 (2014) (holding, with respect to a claim of self-representation, that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshal v. Rodgers*, 133 S. Ct. 1446, 1450 (2013); *White*, 134 S. Ct. at, 1703 (same, respecting a claim regarding the privilege against self-incrimination); *Parker*, 132 S. Ct. at 2155 ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

chances at sentencing.  (*Id.*, 255-58.)  Counsel emphasized the absence of fingerprints linking Petitioner

to the box cutter that Sanford reported finding.  (*Id.*, 254-55.)

On rebuttal, the prosecutor argued that, if both Crayton and Sanford were lying, they were

telling the same lie:  about Petitioner demanding money and about Petitioner holding the open box cutter

while doing so.  (*Id.*, 265.)  The prosecutor continued:

> Officer Burkett told you that he ruled out the other suspects. . . . He has no interest
> in seeing the wrong person get convicted of a crime.  The reason he didn't follow up with
> this other boogieman [sic] of Bobby Shears is because he believed in his ten years of police
> experience that he wasn't the right guy.  He had reason to believe that [Petitioner] was the
> right guy, and that reason was confirmed when he put together a photo lineup that he stuck
> in front of [Sanford].  And why was it a photo lineup?  When the facts aren't on your side,
> you start to create these boogiemen like Bobby Shears and live lineups.

(*Id.*, 266.)  Finally, having gone through the evidence, the prosecutor made the following argument:

> This is not a popularity contest.  This isn't about deciding the prom queen or who
> you want to come over to your house for tea.  This is the real lives or real people who were
> honest with you, who were honest with you when they testified about what happened or as
> honest as they could be.

> They're not out to get Jakima Patterson.  He's here because two people placed him
> at the scene, one of those people picked him out of a lineup, and both of those people said
> he had a box cutter.  That's why he's here.  No because of a bad investigation, not because
> there was no live lineup.  He was here because all of the witness statements and all the
> investigations pointed to him.

(*Id.*, 267-68.)

As is obvious from the excerpted arguments recited here, the prosecutor merely argued

about what inferences the jury should draw from the evidence presented in the case.  It is appropriate for

the prosecutor to invite the jury to examine the testimony they have heard at trial, draw reasonable

inferences, and examine the motives witnesses may have for lying.  *See Cantrell v. Gray*, No. 84-3686,

1986 WL 16540, at *3 (6th Cir. Feb. 7, 1986); *see also United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir.); *Rodriguez v. Peters*, 63 F.3d 546, 564 (7th Cir. 1995); *Kappos v. Hanks*, 54 F.3d 365, 368 (7th Cir. 1995). Nothing about the prosecutor's argument suggests that the prosecutor was aware of additional facts or that he was impermissibly placing the government's prestige behind the witnesses. In fact, the prosecutor's entire argument focused on the imperfection of its own witnesses' credibility.

Moreover, any possible impropriety was cured by the jury instructions. The court instructed the jury that the lawyers' statements and arguments were not evidence. (*Id.*, 270.) As courts have recognized, instructing a jury that the arguments are not evidence has sometimes been deemed to cure any improprieties in a closing argument. *Byrd v. Collins*, 209 F.3d 486, 538 (6th Cir. 2000) In addition, the court instructed the jury on how it should evaluate the credibility of witnesses (*Id.*, 273), which also serves to cure any improprieties in the court's. *Id.* There exists an "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206-07 (1987). "'[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.'" *United States v. Olano*, 507 U.S. 725, 740 (1993) (quoting *Francis v. Franklin*, 471 U.S. 307, 324, n.9 (1985)).

In his final argument, Petitioner contends that counsel was ineffective in failing to object to the admission of Burkett's evidence and the prosecutor's arguments in closing and on rebuttal. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective

standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals held, because there was no due process violation in the admission of evidence or the prosecutor's argument, counsel was not ineffective in failing to object. That

conclusion was patently correct. The courts repeatedly have held that an attorney's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

For all these reasons, Petitioner fails to show that the state court's disposition of his first habeas ground was either contrary to or an unreasonable application of clearly established Supreme Court precedent.

## II. Failure to Conduct a Live Lineup

Petitioner argues that he was denied due process by the prosecution's failure to conduct a live lineup, relying instead on a photographic lineup. He also argues that counsel was ineffective in moving to suppress the photo lineup. The Michigan Court of Appeals addressed the issue as follows:

> "A photographic identification procedure violates a defendant's right to due process of law when it is so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification." *People v Gray*, 457 Mich 107, 110; 577 NW2d 92 (1998). "[I]mproper suggestion in photographic identification procedures may arise when the witness is shown . . . a group of people in which one person is singled out in some way." *People v McAllister*, 241 Mich App 466, 472; 616 NW2d 203 (2000). "[T]he remedy for an unduly suggestive identification procedure is suppression of the in-court identification unless there is an independent basis for its admission." *People v Davis*, 241 Mich App 697, 702; 617 NW2d 381 (2000).

> Generally, the photo spread is not suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features and thus sufficient to reasonably test the identification. Thus, differences in the composition of photographs, in the physical characteristics of the individuals photographed, or in the clothing worn by a defendant and the others pictured in a photographic lineup have found not

-24-

to render a lineup impermissibly suggestive. [*People v Kurylczyk*, 443 Mich 289, 304-305; 505 NW2d 528 (1993).]

Nothing in the record indicates that the photographic lineup did not contain photographs that were fairly representative of "defendant's physical features and thus sufficient to reasonably test the identification." *Id.* at 304. Defendant has not shown, and we do not conclude, that the mere position of his photograph at the top left within the lineup was "so impermissibly suggestive that it [gave] rise to a substantial likelihood of misidentification." *Gray*, 457 Mich at 110. Accordingly, defendant has not shown the existence of a plain error. *Id.* Further, we reject defendant's concomitant argument that defense counsel was ineffective for failing to moving to suppress the victim's in-court identification. *Ericksen*, 288 Mich App at 201 (counsel is not ineffective for failing to advance a meritless argument). We also reject defendant's argument that counsel was ineffective for failing to request a corporeal lineup. Defendant does not have a right to any lineup unless he has shown "that there is a reasonable likelihood of mistaken identification that a lineup would tend to resolve." *McAllister*, 241 Mich App at 471. Defendant has not shown a reasonable likelihood of mistaken identification that a live lineup would resolve and, thus, defense counsel was not ineffective for not requesting such a lineup. *Id.*; *Ericksen*, 288 Mich App at 201.

(MCOA Op. at 5.)

Although the court of appeals cited only Michigan law in reaching its decision, the legal standards on which it relied were consistent with Supreme Court precedent. Due process provides a "check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, —— U.S. ——, 132 S. Ct. 716 (2012). The principle of due process "prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification." *United States v. Peterson*, 411 F. App'x 857, 864 (6th Cir. 2011) (citing *Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000)). In determining whether an unacceptable risk of misidentification with regard to a photo lineup exists, courts employ a two-step analysis. *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388 U.S. 293, 301–02 (1967),

and citing *Neil v. Biggers*, 409 U.S. 188, 197 (1972)). The first step requires a determination as to whether the identification was "unnecessarily suggestive." *Id.*. To make this determination, "the court may consider 'the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves.'" *United States v. McComb*, 249 F. App'x 429, 437 (6th Cir. 2007) (citing *United States v. Sanchez*, 24 F.3d 1259 (10th Cir. 1994)); *see also United States v. Wade*, 388 U.S. 218 (1967). The second step of the inquiry requires consideration of a number of factors, including

> The factors considered in making this determination include: "1) the witness's opportunity to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation."

*McComb*, 249 F. App'x at 437 (citing *United States v. Beverly*, 369 F.3d 516 (6th Cir. 2004)); *see also Haliym*, 492 F.3d at 704 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), and *Biggers*, 409 U.S. at 199-200). If "the first step of the requisite analysis ends in the government's favor, [the court] need not address" the second step of the inquiry. *United States v. Stamper*, 91 F. App'x 445, 462 (6th Cir. 2004).

Petitioner makes no serious attempt to argue that the six-photo photographic lineup was unduly suggestive. He complains that his photograph appeared in the upper left corner of the array. Absolutely no case law supports a conclusion that a photographic array is unduly suggestive simply because the defendant appears in the first of six photos. Moreover, as the court of appeals observed, the record contains no evidence that the photograph's were themselves problematic or the that the police prompted or encouraged the witness to identify Petitioner. As a consequence, Petitioner fails to demonstrate any error

-26-

in the state court's conclusion that the array was not unduly suggestive. The Court therefore need not address the second step of the inquiry. *Stamper*, 91 F. App'x at 462.

Moreover, Petitioner had no independent constitutional right to a corporeal lineup. In *Simmons v. United States*, 390 U.S. 377, 384–86 (1968), the United States Supreme Court acknowledged that a corporeal identification is usually more accurate than a photographic identification, but it affirmed the propriety of photographic arrays, relying upon "a course of cross-examination at trial which exposes to the jury the method's potential for error" and explicitly declining "to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement." *Simmons*, 390 U.S. at 384. Federal courts have since held that a criminal defendant has no constitutional right to a corporeal line-up. *See, e.g., United States v. Storer*, No. 91-30103, 1992 WL 45764, at *1 n.1 (9th Cir. 1992) (unpublished); *Branch v. Estelle*, 631 F.2d 1229, 1234 (5th Cir. 1980); *Payne v. Smith*, 207 F. Supp. 2d 627, 644–645 (E.D. Mich. 2002).

Finally, as the Michigan Court of Appeals held, Petitioner's claim that counsel was ineffective in failing to move to suppress the out-of-court identification or to challenge the in-court identification is utterly without merit. As previously discussed, the photographic array was not unduly suggestive and therefore was admissible. Any motion to suppress, therefore, would have been frivolous. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506; *Chegwidden*, 92 F. App'x at 311; *Harris*, 204 F.3d at 683.

For all these reasons, the court of appeals' denial of Petitioner's second habeas ground was an entirely reasonable application of established Supreme Court precedent.

III.      Reference to Right to Remain Silent

Petitioner next argues that he was denied his Fifth and Fourteenth Amendment right to remain silent when Officer Burkett gave unresponsive testimony that Petitioner had exercised his right to remain silent. Specifically, Petitioner complains about the following series of questions and answers between defense counsel and Officer Burkett:

Q       Did anyone take a statement from [Petitioner]?

A       I believe Detective Erlandson attempted to interview him and he invoked his right to remain silent.

Q:      Were you there when he interviewed him?

A:      No.

Q:      Okay. So you don't know if [Petitioner] said anything to him.

A:      You asked if anyone interviewed him.

Q:      Yeah.

A:      That's –

Q:      But you don't know if he invoked right away of if he actually did say some things to him, is that correct?

A:      You would have to ask Detective Erlandson. I'm - I wasn't there for the interview.

Q:      Okay. Did you – you – but you didn't talk to [Petitioner] about his side.

A:      No.

Q:      Okay. Thank you.

(Tr. II, 234.) Petitioner also contends that trial counsel was ineffective in failing to object.

The court of appeals addressed both claims as follows:

-28-

Defendant next argues that Officer Burkett's reference to defendant's invocation of his right to silence violated his Fifth and Fourteenth Amendment rights. We disagree. We find that under the doctrine of invited error, defendant waived review of whether Officer Burkett's reference to defendant's silence violated his Fifth and Fourteenth Amendment rights. *People v McPherson*, 263 Mich App 124, 138-139; 687 NW2d 370 (2004). At trial, defense counsel cross-examined Officer Burkett regarding the police investigation. Defense counsel asked Officer Burkett "Did anybody take a statement from [defendant]?" Officer Burkett answered "I believe Detective Erlandson attempted to interview [defendant] and he invoked his right to remain silent." "Under the doctrine of invited error, a party waives the right to seek appellate review when the party's own conduct directly causes the error." *Id.* at 139. Here, Officer Burkett's challenged statement was responsive to defense counsel's question about whether any police officer had interviewed defendant. See *People v Dennis*, 464 Mich 567, 575; 628 NW2d 502 (2001). Moreover, defense counsel did not object to Officer Burkett's reference to defendant's silence, but instead continued asking questions about defendant's statements to the police. Accordingly, because defendant invited the alleged error, i.e., Officer Burkett's reference to defendant's silence, and did not object to Burkett's response, defendant "lost his right to assert this issue on appeal." *McPherson*, 263 Mich App at 139. Thus, we need not consider this issue on appeal. *Id.*

We also reject defendant's concomitant argument that defense counsel was ineffective for inviting Officer Burkett's response and failing to object to Burkett's reference to defendant's silence. In order to show that defense counsel's performance fell below an objective standard of reasonableness, defendant must "overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances." *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). We find that while defense counsel invited Officer Burkett's reference to defendant's silence, counsel's line of questioning appears to have been directed at developing the defense's theory that the police failed to conduct an adequate investigation. Defense counsel's cross-examination of Officer Burkett sought to show that the police failed to follow viable leads or investigate defendant's side of the story. On the record before this Court, defendant has not "overcome the strong presumption that" defense counsel's cross-examination "constituted sound trial strategy under the circumstances." *Id.*[;] see also *McPherson*, 263 Mich App at 139 n 12 (holding that although defense counsel's cross-examination invited the error and waived appellate review of the issue, the defendant's alternative claim of ineffective assistance of counsel must fail because the defendant did "not overcome the presumption that" counsel's conduct was "a matter of trial strategy").

(MCOA Op. at 5-6.)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

-30-

In the instant case, the Michigan Court of Appeals expressly relied on the invited-error doctrine in declining to review Petitioner's claim on appeal. The doctrine of invited error, under which a party waives the right to seek appellate review when the party's own conduct directly causes the error, has been long established and regularly followed in Michigan. *People v. McPherson*, 687 N.W.2d 370 (Mich. Ct. App. 2004) (citing *People v. Jones*, 662 N.W.2d 376 (2003) (upholding the related doctrine of "invited response"), and *City of Warren v. Nelson M. Sharrow Excavating Co., Inc.*, 194 N.W.2d 304, (Mich. 1972) (recognizing the long tradition behind the invited-error doctrine)). The rule thus constitutes an independent and adequate ground on which to decide the question. Moreover, Petitioner unquestionably committed the state-court error, given that the complained of error occurred as the result of multiple questions from defense counsel about whether Petitioner gave a statement to the police, including one question in which counsel herself stated that Petitioner had invoked his right. As a consequence, Petitioner has procedurally defaulted his claim on habeas review.

As discussed, when a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485; *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999). Petitioner asserts that the ineffective assistance of trial counsel amounts to cause excusing his default. While ineffective assistance of counsel may serve as cause excusing a default, a petitioner must show that his attorney's alleged failures rose to the level of a constitutional violation under *Strickland*, 466 U.S. 668. *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

The state court held that trial counsel's actions were part of a overall trial strategy designed to show that the police had failed to follow leads or investigate Petitioner's version of the case. That conclusion was not an unreasonable reading of the court record. Trial counsel consistently attacked Burkett's investigation, and she eventually coaxed an admission from Burkett that he did not talk to Petitioner about his version of the events before coming to his conclusions. (Tr. II, 234.) Petitioner fails to overcome the presumption of reasonableness accorded counsel's trial strategies, *see Strickland*, 466 U.S. at 689, much less to overcome the double deference accorded to state-court determinations on habeas review. *See, e.g., Harrington*, 562 U.S. at 105 (citing *Knowles*, 556 U.S. at 123).

Moreover, Petitioner cannot show prejudice for his default. Prejudice requires the Petitioner to show that the alleged error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "'[T]he prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of Petitioner's guilt and a lack of evidence to support his claim.'" *Perkins*, 58 F.3d at 219 (quoting *Rust*, 17 F.3d at 161-62). Here, two of the three witnesses who testified at trial, including Petitioner's co-defendant, identified Petitioner as one of the perpetrators of the crime. Both witnesses told substantially consistent stories. Notwithstanding defense counsel's attempts to cast doubt on these witnesses' testimony, the evidence against Petitioner was strong. Petitioner therefore cannot demonstrate that Burkett's mention that Petitioner invoked his rights worked to his actual and substantial disadvantage.

Finally, Petitioner cannot show that the procedural default results in a miscarriage-of-justice. As previously discussed, the exception applies only where a petitioner raises a claim of actual innocence based upon new reliable evidence that makes it more likely than not that no reasonable juror would have

found petitioner guilty beyond a reasonable doubt. *House*, 547 U.S. at 536 (citing *Schlup*, 513 U.S. at 327). Petitioner does not claim actual innocence, much less provide new reliable evidence of that innocence.

For all these reasons, Petitioner is not entitled to relief on his third habeas ground.

IV.   <u>Prosecutorial Misconduct – Denigrating the Defense</u>

In his final habeas ground, Petitioner argues that the prosecutor violated Petitioner's right to a fair trial by denigrating his defense during rebuttal argument. Petitioner also argues that his attorney was ineffective in failing to object to the prosecutor's comments.

Petitioner's fourth habeas ground is interconnected with his first ground, insofar as he again complains that the prosecutor committed misconduct during the same portion of rebuttal argument. The Michigan Court of Appeals, however, addressed Petitioner's claim independently:

> Next, defendant argues that the prosecutor denied defendant his right to a fair trial by denigrating him during the rebuttal argument. During his rebuttal argument, the prosecutor stated, in relevant part:

>> Officer Burkett told you that he ruled out the other suspects. Again, like . . . the victim . . . [Officer Burkett] has no interest in seeing the wrong person get convicted of a crime. The reason he didn't follow up with this other boogieman of Bobby Shears is because he believed in his ten years of police experience that he wasn't the right guy. He had reason to believe that [defendant] was the right guy, and that reason was confirmed when he put together a photo lineup that he stuck in front of [the victim]. And why was it a photo lineup? When the facts aren't on your side, you start to create these boogiemen like Bobby Shears and live lineups. [Emphasis added.]

> Defendant claims the prosecutor committed misconduct during his rebuttal argument by accusing the defense of intentionally misleading the jury by creating "boogiemen." "[A] prosecutor 'must refrain from denigrating a defendant with intemperate and prejudicial remarks[.]'" *People v Cox*, 268 Mich App 440, 452-453; 709 NW2d 152 (2005). "[T]he prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury." *Fyda*, 288 Mich App at 461. However, "the prosecution's remarks must be

considered in light of defense counsel's comments and . . . an otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument." *Unger*, 278 Mich App at 238 (quotation omitted).

Here, the prosecutor made his challenged comments during his rebuttal argument and in direct response to defense counsel's argument that the jury should acquit defendant on the basis of Shears and the absence of a live lineup. Accordingly, we find that "the prosecutor's comments were responsive to [defendant's] arguments" and "properly addressed the weaknesses of [defendant's] theory of defense[.]" *Fyda*, 288 Mich App at 462; see also *People v Dobek*, 274 Mich App 58, 67; 732 NW2d 546 (2007) (holding that "[a]lthough the prosecutor's comments might have suggested that defense counsel was trying to distract the jury from the truth, the comments were, in general, properly made in response to defense counsel's" argument). Moreover, "[t]he fact that the prosecutor employed colorful rhetoric does not make the response to" the defendant's arguments improper. *Fyda*, 288 Mich App at 462; see also *People v Matuszak*, 263 Mich App 42, 55-56; 687 NW2d 342 (2004) (citation omitted) ("While the prosecution's assertion that the defense argument was ridiculous may have been characterized differently, a prosecutor need not state arguments in the blandest possible terms."). Accordingly, we find that defense counsel was not ineffective for failing to object to the prosecutor's rebuttal argument because such an objection would be meritless. *Cox*, 268 Mich App at 453.

(MCOA Op., 6-7.)

As the state court recognized, a prosecutor is free to argue from the evidence that certain defense witnesses are lying, but may not denigrate the defense or defense counsel. *See Hanna v. Price*, 245 F. App'x 538, 545-46 (6th Cir. 2007); *Bates v. Bell*, 457 F.3d 501, 525 (6th Cir. 2006). The courts have held, however, that not every aspersion cast by a prosecutor upon a defense attorney's presentation of a case requires reversal of the guilty verdict. *See Young*, 470 U.S. at 11 (stating that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial"). "A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly

-34-

excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992); *see also Brown*, 231 Fed. Appx. at 480 (holding that a prosecutor's isolated comments in closing argument that the defense was attempting to trick the jury is not an improper disparagement of defense counsel).

Here, while using the word "boogieman," the prosecutor relied on the evidence to explain why juror's should not accept defense counsel's closing arguments that the prosecution had not adequately investigated Bobby Shears and had not conducted a live lineup. (Tr. II at 143, 145-46.). Under these circumstances, the arguments were not improper. Moreover, even had the prosecutor's comments been improper, they were not flagrant enough to justify habeas relief. *See Henley v. Cason*, 154 Fed. Appx 445, 447 (6th Cir. 2005). The prosecutor's comments were not so incendiary so as to inflame the jury's passion or distract them from determining petitioner's guilt or innocence. *See Davis v. Burt*, 100 Fed. Appx. 340, 348 (6th Cir. 2004). When combined with the instruction from the trial judge that the attorneys' arguments, questions, and statements were not evidence, the prosecutor's comments did not render the entire trial fundamentally unfair. *Byrd*, 209 F.3d at 533.

In addition, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender*, 376 F.3d at 528 (citing *Bowling*, 344 F.3d at 512). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle*, 457 F.3d at 516 (quoting *Donnelly*, 416 U.S. at 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 132 S. Ct. at 2155 (internal quotation omitted). Petitioner cannot make the requisite showing, as the state court's rejection of his claim was entirely reasonable.

Finally, the state court reasonably rejected Petitioner's claim that his attorney was ineffective in failing to object to the used of the word "boogieman." Because Petitioner's prosecutorial misconduct claim was without merit, his attorney could not be ineffective for failing to object. *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506; *Chegwidden*, 92 F. App'x  at 311; *Harris,* 204 F.3d at 683.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A

petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:   August 4, 2016                    /s/ Paul L. Maloney
                                           Paul L. Maloney
                                           United States District Judge